**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DEBORAH LAKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:12-CV-2355-JAR |
| | ) | |
| CAROLYN COLVIN, | ) | |
| ACTING COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant.[1] | ) | |
| | ) | |

**MEMORANDUM AND ORDER**

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of

Social Security's final decision denying Deborah Lake's ("Lake") application for disability

insurance benefits pursuant to 42 U.S.C. § 423 and supplemental security income ("SSI") under

the Social Security Act, 42 U.S.C. § 1382. Lake alleges in her disability report that she suffers

from a disability due to chronic neck pain, carpal tunnel syndrome in the left wrist, depression,

bipolar disorder, headaches, and upper extremity pain. (Tr. 194.)

**I.    Background**

Lake protectively filed her applications for disability insurance under Title II of the Act,

42 U.S.C. §§401, *et seq.* (Tr. 156-59), and for supplemental security income (SSI) benefits under

Title XVI of the Act, 42 U.S.C. §§1381, *et seq.* (Tr.160-86). The Social Security Administration

("SSA") denied Lake's application for benefits initially (Tr. 112-16), and she filed a timely

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule
25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Michael J. Astrue as the
defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of 42
U.S.C. § 405(g).

request for a hearing before an Administrative Law Judge ("ALJ"). (Tr. 117-19). On February 6, 2012, following a hearing, the ALJ found that Plaintiff was not under a disability, as defined under the Act. (Tr. 92-105.)

On October 26, 2012, the Appeals Council denied Lake's request for review. (Tr. 1-5.) The decision of the ALJ thus stands as the final decision of the Commissioner. See Sims v. Apfel, 530 U.S. 103, 107 (2000). Lake filed this appeal on December 19, 2012. (ECF No. 1). The Commissioner filed an Answer. (ECF No. 9.) Lake filed a Brief in Support of her Complaint. (ECF No. 11.) The Commissioner filed a Brief in Support of the Answer. (ECF No. 16). And, Lake filed a Reply Brief in Support of her Complaint. (ECF No. 17.)

## II.     Decision of the ALJ

The ALJ determined that Lake met the insured status requirements of the Social Security Act through December 31, 2011. (Tr. 94.) The ALJ found that Lake has not engaged in substantial gainful activity since July 15, 2010, the alleged onset date of disability. (Id.) The ALJ determined that Lake has the severe impairments of hypertension, obesity, affective disorder, overactive bladder, headaches, cervical radiculopathy, carpal tunnel syndrome (CTS), and status post elbow ulnar release. (Id.) However, considering all of the evidence, the ALJ found that Lake did not have any impairments or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 95). The ALJ found that Lake had the residual functional capacity ("RFC") to perform light work, which he defined as:

> Can occasionally lift or carry 20 pounds; can frequently lift or carry 10 pounds; and occasionally push or pull 20 pounds; can frequently push or pull 10 pounds; can stand or walk for up to 6 hours in an 8 hour workday with normal breaks; can sit for up to 6 hours in an 8 hour workday with normal breaks; can frequently push or pull 10 pounds; can sit or walk for up to 6 hours in an 8 hour workday with normal breaks; can sit for up to 6 hours in an 8 hour workday with normal

breaks; can frequently push or pull with her upper extremities; can occasionally reach overhead with both upper extremities; avoid concentrated exposure to cold temperatures and vibrations; can remember, understand, and carry out simple job instructions; can maintain adequate attendance and sustain an ordinary routine without special supervision; can interact adequate[ly] with peers and supervisors; and can adapt to most common changes in a competitive work setting.

(Tr. 97). The ALJ also determined that while Lake is unable to perform any past relevant work, there are jobs that exist in significant numbers in the national economy that Lake can perform. (Tr. 103-04). Finally, the ALJ concluded that Lake has not been under a disability, as defined in the Social Security Act, from July 15, 2010 through the date of the decision. (Tr. 105).

Lake appeals contending that the ALJ erred by not giving enough weight to the opinions of her treating physicians. Lake also asserts that the ALJ erred by arbitrarily determining a RFC for Lake that did not include proper limitations. The Commissioner contends that the ALJ's decision is supported by substantial evidence on the record as a whole.

## III. Administrative Record

The following is a summary of relevant evidence before the ALJ.

### A. Hearing Testimony

#### 1. Lake's Testimony

Lake testified as follows. Lake was born on February 6, 1965. (Tr. 12.) Lake completed 9th grade in school and got her GED in the 1980s. (Tr. 15.) She had Job Corps training for a clerical trade. (Tr. 15.) Lake weighs approximately 242 pounds. (Tr. 12.) She states that she recently gained approximately 30 pounds due to the medication she is on. (Id.) She lives alone at her apartment. (Tr. 13.) She is divorced but has a boyfriend. (Tr. 13-14.) She has a driver's license with no restrictions. (Tr. 13.) She drives short distances. (Tr. 14.) She goes to the grocery store for major shopping once or twice a month but her boyfriend drives. (Id.) She

usually takes medical transportation to her doctor's appointments, or her boyfriend drives her. (Tr. 15.)

Lake testifies that she has not worked since her alleged onset date of July 15, 2010.  (Tr. 16.)  She last worked on May 16, 2006.  (Id.)  She claims that she became unable to work because she has two herniated discs in her neck and carpal tunnel in both wrists.  (Id.)  She had surgery twice on her right elbow for epicondylitis[2] and surgery on her left elbow to relieve the ulnar nerve.  (Tr. 17.).  In January 2010, the doctors told her she has improved as much as she ever will.  (Id.)

Lake previously worked in customer service at Delta Dental between 1997 and 2006. (Tr. 18.)  The most Lake lifted at that job was 10 pounds, with mostly sitting and some standing and walking.  (Tr. 19.)

Lake states that she is unable to work because she suffers from chronic neck pain all the time, which increases with activities such as sitting, standing, driving.  (Tr. 19-20.).  Lake also asserts that she has carpal tunnel syndrome on both hands from her elbows to her hands.  (Tr. 20.)

Lake has a primary care physician, Dr. Keith Segall; a neurologist, Dr. Akhtar M. Choudhary, that she sees once a month for pain medication; a psychiatrist, Dr. Maria Menendez that she sees once a month for antidepressant medication; and a psychologist, Dr. Randee J. Feco that she sees twice a month for talk therapy.  (Tr. 20-24, 27.)  Lake is not aware of any restrictions that her doctors have put on her.  (Tr. 20-24.)

---

[2] It is unclear from the record whether Lake suffered from lateral or medial epicondylitis. Tennis elbow, or lateral epicondylitis, is a painful condition of the elbow caused by overuse.  See http://orthoinfo.aaos.org/topic.cfm?topic=a00068.  Golfer's elbow, or medial epicondylitis, is an inflammation of the tendons that attach your forearm muscles to the inside of the bone at your elbow.  See http://orthoinfo.aaos.org/topic.cfm?topic=A00137.

At the time of the hearing Lake was taking medications, including Percocet, Naproxen[3], Skelaxin[4] and Gabapentin[5] for pain. (Tr. 24.) Lake also was taking Cymbalta[6], Abilify[7] and Elavil[8] for depression. (Tr. 39.) Lake claims that the pain medications take the pain down a level but they do not take the pain away. (Tr. 24.) Lake states that her pain medications have the side effects of making her sleepy, drowsy, and shaky, and cause her to have dry mouth. (Tr. 24-25.) Lake has not been to the emergency room or hospitalized, other than once for a really bad headache, since July 2010. (Tr. 25-28.) Lake has not had surgery since July 2010. (Tr. 25-26.) In 2011, Lake had an injection at a "pain center" to try to alleviate her pain. (Tr. 26.) Lake wears her TENS[9] unit twice a day for about 45 minutes, a neck brace at night, and braces on her wrists when she does activities such as driving. (Tr. 26.) Lake does not smoke cigarettes and has not used alcohol since 2007. (Tr. 28.)

Lake states that she suffers from deep pain in her neck and has muscle spasms in her neck that also causes her headaches. (Tr. 29.) She states that she has neck pain all the time (Tr. 29, 36) and that being upright makes it worse (Tr. 30.) She spends most of her day lying down. (Tr.

---

[3] Naproxen is used to relieve pain from various conditions such as headaches, muscle aches, tendonitis, dental pain, and menstrual cramps. It also reduces pain, swelling, and joint stiffness caused by arthritis, bursitis, and gout attacks. This medication is known as a nonsteroidal anti-inflammatory drug (NSAID). It works by blocking your body's production of certain natural substances that cause inflammation. See http://www.webmd.com/drugs/mono-1289-NAPROXEN+-+ORAL.aspx?drugid=5173&drugname=naproxen+oral&source=1.

[4] Skelaxin is used to treat muscle spasms and pain. See http://www.webmd.com/drugs/drug-7897-Skelaxin+oral.aspx?drugid=7897&drugname=Skelaxin+oral&source=1.

[5] Gabapentin is used with other medications to prevent and control seizures. See http://www.webmd.com/drugs/mono-8217-GABAPENTIN+-+ORAL.aspx?drugid=14208&drugname=gabapentin+oral&source=1.

[6] Cymbalta is used to treat depression and anxiety. See http://www.webmd.com/drugs/drug-91491-Cymbalta.aspx?drugid=91491&drugname=Cymbalta.

[7] Abilify is used to treat certain mental/mood disorders (such as bipolar disorder, schizophrenia, and irritability associated with autistic disorder). It may also be used in combination with other medication to treat depression. See http://www.webmd.com/drugs/drug-64439-Abilify+oral.aspx?drugid=64439&drugname=Abilify+oral&source=1.

[8] Elavil is used to treat mental/mood problems such as depression. See http://www.webmd.com/drugs/drug-1807-Elavil+oral.aspx?drugid=1807&drugname=Elavil+oral&source=1#uses.

[9] TENS, or transcutaneous electrical nerve stimulation, is a pain treatment that uses low voltage electric current to relieve pain. TENS is typically done with a TENS unit, a small battery-operated device. The device can be hooked to a belt and is connected to two electrodes. The electrodes carry an electric current from the TENS machine to the skin. See http://www.webmd.com/back-pain/guide/tens-for-back-pain.

30.)  She has headaches that last one to two days at least eight times a month.  (Tr. 30.)  Lake has pain in her wrists when she does activities so she tries to limit activities.  (Tr. 31.)  Lake has difficulty sleeping due to her neck pain, even though she takes Elavil and Ambien to sleep.  (Tr. 31.)

Lake can bathe and dress herself, except she has pain when raising her arms to wash her hair.  (Tr. 32.)  She does dishes, vacuuming and laundry with some help and rests.  (Tr. 32, 37-38.)  She microwaves meals.  (Tr. 32.)  She sweeps but does not mop.  (Tr. 32.)  She never goes to movies or to restaurants and does not use the internet. (Tr. 33-34, 43.)  She has no hobbies and does not exercise.  (Tr. 34.)  She has problems pushing and pulling on things due to pain.  (Tr. 39.)  She cannot push a shopping cart.  (Tr. 39-40.)  She refills her own prescriptions.  (Tr. 40.)  She can walk a couple of blocks before she has to stop because of pain in her neck.  (Tr. 41.)  She can sit for up to 30 minutes before she has to stand up.  (Tr. 41.)  She can only stand for a few minutes before she must sit.  (Tr. 41-42.)

## 2.    Vocational Expert's Testimony

Vocational Expert Michael J. Weisman testified as follows.  Lake has past work as customer service insurance clerk and is listed in the Dictionary of Occupational Title as semi-skilled.  (Tr. 45-46.)  The specific vocational preparation (SVP) is 4 and had an exertional level of sedentary.  (Tr. 45-46.)  Lake cannot perform her past work of a customer service insurance clerk because such work was semi-skilled.  (Tr. 45-47.)  As previously noted, ALJ described Lake's RFC as the ability to perform the demands of light work, could lift or carry 20 pounds occasionally, 10 pounds frequently, push or pull the same, could stand or walk up to 6 hours, could sit up to 6 hours in a usual workday, all with normal breaks, could frequently push, pull with her upper extremities, could occasionally climb stairs, ramps and ladders and scaffolds,

occasionally reach overhead with both upper extremities, avoid concentrated exposure to cold and vibrations, can remember, understand and carry out simple instructions, can maintain adequate attendance and sustain an ordinary routine without supervision, interact adequately with peers and supervisors and adapt to most common changes in competitive work setting. (Tr. 46). Based upon this RFC, the vocational expert discerned that a person the same age, education and work experiences as Lake could perform light work, such as an arcade attendant and a parking lot attendant. (Tr. 47-48.) Lake could also perform light, sedentary work, such as an order clerk or a clerical mailer. (Tr. 48.)

The vocational expert further testified that, if a hypothetical person needed to recline or lie down for 30 minutes every 2 hours, employment would be precluded. (Tr. 49.) The vocational expert stated that, if a hypothetical person was completely off task at least 20 percent of the time due to pain or other physical issues, the person would not be able to maintain employment. (Tr. 49-50.) The vocational expert asserted that, if a hypothetical person missed more than 5 days a month due to pain or other issues, the person would not be able to maintain employment. (Tr. 50.) The vocational expert testified that, if a hypothetical person was limited to lifting and carrying only five pounds, could stand and walk less than 15 minutes without a break, stand and walk less than one hour in an eight-hour day, and sit less than an hour in an eight-hour day, then such an individual could not maintain employment due to the frequency of breaks required. (Tr. 50.) Also, the vocational expert said that if an individual had limitations that seriously interfered with her ability to function independently in regards to scheduling and maintaining regular attendance and being punctual and also to respond appropriately to changes in a work setting and complete a normal workday and work week without interruption, then that individual could not maintain employment. (Tr. 50-51.)

## B. Medical Records

Lake's relevant medical records are summarized as follows:

Dr. Segall saw Lake at the Vienna Family Practice, LLC from October 22, 2009 through December 12, 2011. (Tr. 389-420). Dr. Segall saw Lake approximately once every month, and often once every two weeks during that time period. Dr. Segall completed a Medical Source Statement—Mental on January 5, 2012. (Tr. 424-25). Dr. Segall claimed that Plaintiff was markedly limited in her ability to understand and remember detailed instructions; her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and her ability to respond to changes in the work setting. (Tr. 424-25.) Dr. Segall also completed a Medical Source Statement-Physical. Dr. Segall indicated that Lake could lift and/or carry frequently 5 pounds, stand and/or walk continuously less than 15 minutes, stand and/or walk throughout the day less than 1 hour, sit continuously at one time 30 minutes, sit throughout the work day less than 1 hour, push and/or pull no more than 5 pounds for no greater than 30 mintues (Tr. 421-22.) Dr. Segall also indicated that Lake should never climb, crawl or handle. (Id.) Dr. Segall stated that Lake should avoid any exposure to extreme cold or heat, wetness or humidity, vibration or heights. (Id.) Dr. Segall opined that Lake needed to lie down or recline every 30 minutes for an hour. (Id.) Dr. Segall also stated that Lake's medications made her tired and affected her concentration. (Id.)

On July 16, 2010, Lake underwent a sleep study at Rolla Neurology. (Tr. 280.) In July 2010, Plaintiff had a device implanted to address her overactive bladder problems. (Tr. 361-64.) After the procedure, Lake reported that her need to get up at night to urinate was cut in half and she reported no daytime urges or frequency by April 2011. (Tr. 353.)

Lake was seen at the Center for Psychiatric Services in October 2010, but it unclear by whom. (Tr. 285-89.) Dr. Feco performed a Medical Source Statement-Mental on September 26, 2011. (Tr. 337-38). Dr. Feco stated that Lake was markedly limited in her ability to understand and remember detailed information; her ability to carry out detailed instructions; her ability to maintain attention and concentration for extended periods; her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and her ability to respond appropriately to changes in the work setting. (Tr. 337-38). Dr. Feco also reported that Lake was extremely limited in her ability to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest period. (Id.)

Dr. Feco saw Lake on October 24, 2011, December 6, 2011. (Tr. 341-43). On October 24, 2011, Dr. Feco reported that Lake's mood was euthymic, her affect was congruent with her mood, she was orientated to person, place, time and situation. (Tr. 341.) Her speech was clear, volume and tone were appropriate. (Id.) Her cognitive processes were logical. She was attentive and focused. Her hygiene and appearance were good. (Id.) Lake said she had stayed in bed for 2 days last week because of the pain and that her pain is usually a 7 or 8 on a scale of 10. (Id.) Lake reported that she wished she could "sleep forever" but would not kill herself. (Id.)

Dr. Choudhary saw Lake from October 2010 through December 6, 2011. (Tr. 278-89, 368-88.) On October 26, 2010, Lake underwent a spinal tap for her headaches by Dr. Choudhary. (Tr. 301-04.) On February 10, 2011, Lake underwent an occipital nerve block on the right side to address her chronic headache. Lake reported that the nerve block helped tremendously for a week. (Tr. 359.) On February 23, 2011, Lake underwent a Motor Nerve Conduction Study, F-Wave Study, Sensory Nerve Conduction Study, Needle EMG Examination,

and Motor Unit Analysis by Dr. Choudhary. (Tr. 371-73.) Dr. Choudhary concluded that the findings were consistent with bilateral carpal tunnel, with the left side being mild in nature. Dr. Choudhary recommended that Lake follow up with clinical visits. (Id.) In March 2011, Dr. Amtul Sami saw Lake. Dr. Sami determined that Lake was not likely to benefit from another occipital nerve block. He also encouraged Lake to stop taking Aleve and follow up with her psychologist to get better management of her antipsychotics because she was on 6 different antipsychotic medications (Tr. 358-60.) Lake denied having a headache on that date. (Id.) Dr. Choudhary saw Lake on May 27, 2011. (Tr. 380). Dr. Choudhary found Lake had degenerative facet disease at C3-4 and C4-5 but no other significant abnormality. (Id.) On September 14, 2011, Dr. Choudhary saw Lake for complaints of headaches and neck pain, and pain radiating to her arms and legs. (Tr. 385.)[10] He noted that Lake is taking medication, which is helping her complaints of headaches and neck pain. (Id.) Lake appeared fairly groomed and she was fluent with her comprehension intact. (Id.) He found that Lake had muscle strength in hand grip of -5/5, and deep tendon reflux of +1. Lake's pin prick sensation was decreased in distribution of C5-C6 bilaterally. (Id.) Dr. Choudhary recommended Lake continue her current medication and undergo a baseline sleep study. (Id.) On October 11, 2011, Dr. Choudhary saw Lake, who complained of headaches and neck pain but said that the medication was helping. (Tr. 384.) Dr. Choudhary ordered Lake to continue on her current medication. (Id.) On November 8, 2011, Lake saw Dr. Choudhary, and she complained of headaches and neck pain. (Tr. 383.). Lake reported that the medication was helping her but that she was feeling tired and her headaches were not getting better. Dr. Choudhary recommended that Lake continue her current medication, undergo a spinal tap, and participate in a baseline sleep study. (Id.) On December 6, 2011, Lake saw Dr. Choudhary. Lake reported that the medication is helping her but that she stopped taking

---

[10] The handwriting on many of Dr. Choudhary's records prior to this are illegible.

the lithium. (Tr. 382.) Dr. Choudhary ordered Lake to continue taking her current medication, do a CPAP titration study, and start taking Diamox.[11] (Id.)

Upon a request and after review of the evidence in Lake's file, on December 21, 2010,[12] Dr. Barbara Markway conducted a psychiatric review and determined that Lake suffered from an affective disorder but was only moderately limited in her ability to understand and remember detailed instructions; her ability to carry out detailed instructions; her ability to maintain attention and concentration for extended periods; her ability to interact appropriately with the general public; her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and her ability to travel in unfamiliar places or use public transportation. (Tr. 308-322.) Dr. Markway found that Lake was otherwise not significantly limited. (Id.) Dr. Markway concluded that Lake retained the ability to understand and remember simple instructions; Lake could carry out simple work instruction and can maintain adequate attendance and sustain an ordinary routine without special supervision; Lake could interact adequately with peers and supervisors; and Lake could adapt to most changes in a competitive work setting. (Id.)[13]

_____

[11] Diamox or Acetazolamide is used to prevent and reduce the symptoms of altitude sickness. This medication can decrease headache, tiredness, nausea, dizziness, and shortness of breath[.]" See http://www.webmd.com/drugs/drug-6753-Diamox+oral.aspx?drugid=6753&drugname=Diamox+oral&source=1.

[12] Although Dr. Markway completed her Medical Source Statement-Mental (December 21, 2010) several months prior to Dr. Feco completing her Medical Source Statement-Mental (September 26, 2011), the Court does not believe that Dr. Markway's opinions are any less relevant. As discussed herein, Lake's mental state has remained relatively constant since the alleged disability onset date. Further, Dr. Feco only saw Lake a few times and, therefore, although her evaluation is more recent it is not necessarily more trustworthy.

[13] Dr. Menendez also filled out a Medical Source Statement-Mental on January 9, 2012. (Tr. 430-32). Dr. Mendendez claimed that Plaintiff was markedly limited in her ability to understand and remember detailed instructions; her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; her ability to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; her ability to accept instructions and respond appropriately to criticism from supervisors; her ability to get along with coworkers or peers without distracting them; and her ability to respond to changes in the work

11

## IV.     Legal Standard

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities … ." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id.

setting. (Tr. 430-32.) This Medical Source statement was not addressed by the parties or by the ALJ so the Court does not address it here.

Fourth, the impairment must prevent claimant from doing past relevant work.[14]   20 C.F.R. §§ 416.920(e), 404.1520(e).  At this step, the burden rests with the claimant to establish his or her Residual Functional Capacity ("RFC").  Steed v. Astrue, 524 F.3d 872, 874 n.3 (8th Cir. 2008); see also Eichelberger, 390 F.3d at 590-91; Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004).  RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments.  20 C.F.R. § 404.1545(b)-(e).  The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f).  If it is found that the claimant can still perform past relevant work, the claimant will not be found to be disabled.  Id.; 20 C.F.R. § 416.920(a)(4)(iv).  If the claimant cannot perform past relevant work, the analysis proceeds to Step V.

At the fifth and last step, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work.  20 C.F.R. § 416.920(a)(4)(v).  If it is found that the claimant cannot make an adjustment to other work, the claimant will be found to be disabled.  Id.; see also 20 C.F.R. § 416.920(g).  At this step, the Commissioner bears the burden to "prove, first that the claimant retains the RFC to perform other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to perform."  Goff, 421 F.3d at 790; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000).  The Commissioner must prove this by substantial evidence.  Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983).

---

[14] "Past relevant work is work that [the claimant] has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it."  Mueller v. Astrue, 561 F.3d 837, 841 (8th Cir. 2009) (citing 20 C.F.R. § 404.1560(b)(1)).

If the claimant satisfies all of the criteria of the five-step sequential evaluation process, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id.; see also Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)).

This court reviews the decision of the ALJ to determine whether the decision is supported by "substantial evidence" in the record as a whole. See Smith v. Shalala, 31 F.3d 715, 717 (8th Cir. 1994). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002); see also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). Therefore, even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the ALJ's decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). In Bland v. Bowen, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

As such, "[the reviewing court] may not reverse merely because substantial evidence exists for the opposite decision." Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006) (quoting Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)). Similarly, the ALJ decision may not be reversed because the reviewing court would have decided the case differently. Krogmeier, 294 F.3d at 1022.

## V.    Discussion

Lake asserts two errors on appeal. First, Lake asserts that the ALJ gave greater weight to a medical expert while affording little weight to Lake's own treating physicians. Second, Lake

contends that the ALJ improperly assessed Lake's RFC and did not consider all of her limitations. The Commissioner contends that the ALJ properly considered the medical opinion evidence and properly considered the Lake's impairments when he determined her RFC.

### A.    Medical Opinion Evidence

Lake contends that the ALJ improperly gave greater weight to a non-examining medical expert and gave less weight to her treating physicians. (ECF No. 11 at 9 (citing Tr. 101.)) Here, Dr. Markway conducted a psychiatric review of the medical records and concluded that Lake was only moderately limited in her ability to understand and remember detailed instructions; her ability to carry out detailed instructions; her ability to maintain attention and concentration for extended periods; her ability to interact appropriately with the general public; her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and her ability to travel in unfamiliar places or use public transportation. (Tr. 308-322.) Dr. Markway found that Lake was otherwise not significantly limited. (Id.) Dr. Markway concluded that Lake retained the ability to understand and remember simple instructions; Lake could carry out simple work instruction and can maintain adequate attendance and sustain an ordinary routine without special supervision; Lake could interact adequately with peers and supervisors; and Lake could adapt to most changes in a competitive work setting. (Id.).

In making a disability determination, the ALJ shall "always consider the medical opinions in the case record together with the rest of the relevant evidence in the record." 20 C.F.R. § 404.1527(b); see also Heino v. Astrue, 578 F.3d 873, 879 (8th Cir. 2009). "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite

impairment(s), and [his or her] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). "It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007). "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if [the conclusions] are inconsistent with the record as a whole." Id.

Generally, a treating physician's opinion is given controlling weight, but is not inherently entitled to it. Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006). A treating physician's opinion "does not automatically control or obviate the need to evaluate the record as a whole." Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007). A treating physician's opinion will be given controlling weight if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p; see also Hacker, 459 F.3d at 937. When given controlling weight, the ALJ defers to a treating physician's medical opinions about the nature and severity of an applicant's impairments, including symptoms, diagnosis and prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions. 20 C.F.R. § 404.1527(a)(2); Ellis v. Barnhart, 392 F.3d 988, 995 (8th Cir. 2005). "A medical source opinion that an applicant is 'disabled' or 'unable to work,' however involves an issue reserved for the Commissioner and therefore is not the type of "medical opinion" to which the Commissioner gives controlling weight." Ellis, 392 F.3d at 994.

In this case, the Court finds that the ALJ properly gave controlling weight to Dr. Markway's opinions instead of Dr. Segall's and Dr. Feco's opinions. First, the ALJ properly performed a credibility analysis of Lake as part of his evaluation of the medical evidence and the RFC determination. "Before determining a claimant's RFC, the ALJ first must evaluate the

claimant's credibility." Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). "In evaluating subjective complaints, the ALJ must consider, in addition to objective medical evidence, any evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions." Pearsall, 274 F.3d at 1218 (citing Polaski v. Heckler, 739 F.2d 1320 (8th Cir.1984)). "Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole." Pearsall, 274 F.3d at 1218 (citing Polaski, 739 F.2d at 1322). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Pearsall, 274 F.3d at 1218 (citing Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir.1987)).

In evaluating Lake's credibility, the ALJ reviewed Lake's testimony and inconsistencies between her testimony and the record, medical evidence (including objective and opinion evidence), the nature and effectiveness of Lake's treatment, third-party statements, Lake's work history, and Lake's daily activities. (Tr. 95-103.) While the ALJ found that Lake had some "significant limitations," those restrictions were not disabling as she claimed and she retained the RFC for light work. (Id.)

The ALJ found that the clinical and objective medical evidence was inconsistent with Lake's allegations of disability. For example, Lake alleged she suffered from chronic neck and upper extremity pain due to her cervical radiculopathy, but the ALJ found that the severity of the pain was not supported in the record. (Tr. 98.) As noted, Lake received monthly treatment by Dr. Choudhary since July 2010. An October 2010 examination revealed only mild weakness in Lake's hands' grip and decreased pinprick sensation in the distribution of C5-C6 bilaterally, but otherwise Lake did not demonstrate any significant deficit of motor, reflex, or sensation. (Tr. 98.) The ALJ noted that in February 2011, Lake underwent an occipital nerve block that helped

tremendously for a week.  (Tr. 98.)  However, in March 2011, Dr. Amtul Sami noted that Lake would not benefit from another occipital block and instead instructed Lake to get better management of her antipychotic medications, to stop taking Aleve, and utilize education materials for management of her back and neck pain.  (Tr. 98.).  A May 2011 x-ray revealed a fusion of the C5 through C7 vertebral bodies with degenerative facet disease at C3-4 and C4-5 but no other significant abnormalities.  (Tr. 98, 380.)  Further, a review of the medical record indicates that Dr. Choudhary's medication types and dosages for Lake have been fairly stable and consistent throughout her treatment.  (Tr. 99.)

With respect to her carpal tunnel syndrome, the ALJ determined that Lake's alleged severity of hand and wrist pain was not supported in the record.  (Tr. 99.)  The ALJ noted that Lake completed several of the disability forms in her own handwriting, despite her claim that she had difficulty using her hands.  (Id.)  Also, a nerve conduction study in February 2011 revealed that Lake's carpal tunnel syndrome was mild in nature and less pronounced in the left extremity. (Id.)  The ALJ held that Lake's carpal tunnel syndrome when combined with the other impairments limited Lake to a range of light work for her RFC.  (Id.)

With respect to Lake's overactive bladder, the ALJ noted that there was evidence of an overactive bladder but the severity of her complaint was not supported by the record.  (Tr. 99.) In July 2010, Lake had an Interstim device implanted to help control her bladder and, in April 2010, Lake reported that her need to get up and urinate was cut in half and she had no daytime urges or frequency.  (Id.)  The ALJ noted that Lake's limitations in this area would allow her to perform jobs that have two, 15-minute breaks and a thirty-minute lunch break, which the vocational expert stated are available.  (Id.).

With respect to Lake's headaches, the ALJ noted that Lake had a documented problem with headaches. (Tr. 99.) However, the ALJ stated that Lake is taking Neurotin as prescribed by Dr. Choudhary and that her medications have been fairly consistent throughout her treatment. (Id.) The ALJ discerned that this lack of fluctuation of medications indicates that her headaches are well controlled and not as severe as she alleges. (Id.)

With respect to Lake's hypertension, the ALJ noted that Lake was diagnosed with this condition since at least April 2010, but she has not alleged any limitation due to hypertension. (Tr. 99, 392, 394-95, 413.) Lake's treatment records indicate that this condition is controlled by treatment. (Tr. 300-03, 396-403, 406-16.)

With respect to Lake's left elbow ulnar release, the ALJ noted that Lake had ulnar release surgery at the left elbow but the alleged severity of her impairment is not supported in the record. (Tr. 99.). The ALJ notes that the record does not reflect regular or consistent treatment for elbow pain during the period of alleged disability. (Id.).

Of particular note, the ALJ found that the medical records demonstrated that Lake's alleged mental impairments were not as severe as she claimed. (Tr. 100.) The ALJ noted that during her hearing Lake indicated that she did a fair number of the normal activities of daily living. (Id.) Lake was able to dust, vacuum, wash dishes, and fold laundry, with some limitations. (Id.) Lake did not need any assistance with her personal grooming or obtaining and taking her medication. (Id.) The ALJ noted that Lake has her driver's license and that she seems able to operate fairly independently. (Tr. 100-01.) Thus, the Court finds that Lake's credibility was properly discounted based upon her own testimony that indicated that she was not as limited as she claimed.

In addition, the ALJ discerned that Lake's treatment records do not support her allegations regarding the severity of her symptoms. As previously discussed Dr. Feco and Dr. Segall both indicated that Lake was markedly limited in several areas due to mental impairment. However, the ALJ noted that Lake had never been hospitalized for a mental impairment and the record did not demonstrate any regular and consistent treatment with a mental health professional. (Tr. 100.) Although Lake testified that she had a regular, biweekly, long-term treatment with Dr. Feco, the record does not reflect this. The record indicates that Dr. Feco saw Lake at the Center for Psychiatric Services in October 2010 and not seen again until October 2011 by Dr. Feco. (Tr. 101.)[15] In October 2011, Lake reported that she contemplated suicide, but the record indicates that she quickly discounted such thoughts because she did not want to hurt her mother or daughter. (Tr. 100.) Dr. Feco reported that Lake was oriented with an euthymic mood and affect, and that she was attentive and focused with a logical cognitive thought process. (Id.) Based upon these records, the Court finds that the ALJ's determination that Lake had some mental impairments that would reduce her ability to perform work activities but did not support additional limitations beyond the determined RFC is supported by substantial evidence.

The Court further finds that the ALJ properly gave little weight to Dr. Segall's opinion in the Medical Source Statement-Mental (Tr. 424-25) and Medical Source Statement-Physical (Tr. 421-22) and little weight to the Medical Source Statement-Mental Dr. Feco, one of Lake's treating psychologist (Tr. 337-38). Instead, the Court finds that the ALJ appropriately gave significant weight to Dr. Markway's opinion that Lake was not disabled because Dr. Markway

---

[15] The ALJ noted that the treatment notes in October 2010 are illegibly signed with a signature that does not match Dr. Feco's signature on the medical source statement. (Tr. 101.) Regardless, the ALJ determined that even if the October 2010 treatment notes were from Dr. Feco the record does not reflect a lengthy or comprehensive treatment relationship, which rendered Dr. Feco's opinions less persuasive. (Id.)

took into consideration the entire documentary file and Dr. Feco only had information from her sessions with Lake. (Tr. 101-02). Dr. Markway noted that Lake did not need reminders, she left her home several times a week and is able to leave the home alone. (Tr. 318.) Dr. Markway reported that Lake was able to shop, that Lake reported she can follow directions "okay," and that she sometimes spends time with other people. (Tr. 318.) Dr. Markway concluded that Lake had an affective disorder, but her mental impairments caused no more than mild to moderate limitations in her ability to perform activities of daily living, maintain social functioning, and maintain concentration, persistence, or pace. (Tr. 308, 316-22.) Dr. Markway determined that Lake retained the ability to understand and remember simple instruction; Lake could carry out simple work instruction and maintain adequate attendance and sustain an ordinary routine without special supervision; Lake can interact adequately with peers and supervisors; and Lake can adapt to most changes in a competitive work setting. (Tr. 322.)

In addition, other evidence in the record supported Dr. Markway's opinion and outweighed the opinions of Dr. Feco and Dr. Segall. Although Dr. Feco and Dr. Segall claim that Lake was markedly limited in several areas, the ALJ and Dr. Markway found that Dr. Feco's and Dr. Segall's treatment notes, as well as Lake's own testimony did not reflect such impairment. Lake never suffered from any significant manic or depressive episodes, particularly any episodes of decomposition or extended periods of deterioration. (Id. at 100.) Dr. Feco noted that Lake was oriented, well groomed and was attentive and focused. (Id.) Likewise, her reasoning was described as normal. (Id.) In addition, the record indicates that Lake's frequency of treatment with Dr. Feco was minimal and sporadic and did not indicate a lengthy and comprehensive relationship. (Tr. 23, 26-27, 101, 284-89, 340-43).

With respect to Dr. Segall, the ALJ gave his opinion little weight because he was not the physician who prescribed claimant's psychiatric medications and she receives her psychiatric treatment from other physicians. (Tr. 102.) Rather, most of Dr. Segall's treatment notes seem to relate to routine other conditions, such as upper respiratory infections. (Tr. 194, 391-419.) Moreover, to the extent that Dr. Segall provided a psychological evaluation of Lake, such evaluation was outside of Dr. Segall's expertise and the ALJ did not err when he disregarded Dr. Segall's opinion for this reason. (Tr. 102.); see Wildman v. Astrue, 596 F.3d 959, 967 (8th Cir. 2010); Brosnahan v. Barnhart, 336 F.3d 671, 676 (8th Cir.2003).

Thus, the Court finds that the substantial evidence supports the ALJ's finding that Lake was less than fully credible and that the ALJ's findings are consistent with Dr. Markway's assessment, which was properly given greater weight. The Court notes that although Plaintiff claims she suffers from significant mental and physical restrictions, her testimony before the ALJ indicated that she was able to perform all of the essential functions of daily living. Lake also has never been hospitalized or suffered from any episodes of decomposition. Moreover, the Court finds that the ALJ provided ample basis for giving Lake's subjective complaints and the opinions of Dr. Segall and Dr. Feco less weight. As indicated, Lake does not see Dr. Segall for her mental health issues, which is outside of his area of expertise, and Lake's treatment with Dr. Feco has been sporadic and limited, in contrast to her testimony before the ALJ. The Court finds that the ALJ properly gave more weight to the opinions of Dr. Markway rather than Lake's treating physicians because Dr. Markway's conclusions, although not based upon her own observations, are supported by the record as a whole, particularly Dr. Segall's and Dr. Feco's treatment notes. Therefore, the Court finds that substantial evidence on the record as a whole supports the ALJ's determination of the medical opinion evidence.

### B.        Residual Functional Capacity

As previously stated, the ALJ in this case determined that Lake's RFC was:

> Can occasionally lift or carry 20 pounds; can frequently lift or carry 10 pounds;
> and occasionally push or pull 20 pounds; can frequently push or pull 10 pounds;
> can stand or walk for up to 6 hours in an 8 hour workday with normal breaks; can
> sit for up to 6 hours in an 8 hour workday with normal breaks; can frequently
> push or pull 10 pounds; can sit or walk for up to 6 hours in an 8 hour workday
> with normal breaks; can sit for up to 6 hours in an 8 hour workday with normal
> breaks; can frequently push or pull with her upper extremities; can occasionally
> reach overhead with both upper extremities; avoid concentrated exposure to cold
> temperatures and vibrations; can remember, understand, and carry out simple job
> instructions; can maintain adequate attendance and sustain an ordinary routine
> without special supervision; can interact adequate[ly] with peers and supervisors;
> and can adapt to most common changes in a competitive work setting.

"The RFC 'is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities,' despite his or her physical or mental limitations." Roberson v. Astrue, 481 F.3d 1020, 1023 (8th Cir. 2007)(citing S.S.R. 96–8p, 1996 WL 374184, at *3 (Soc. Sec. Admin. July 2, 1996); 20 C.F.R. § 404.1545(a)). "When determining a claimant's RFC, the ALJ must consider all relevant evidence, including the claimant's own description of her or his limitations, as well as medical records, and observations of treating physicians and others." Roberson, 481 F.3d at 1023 (citing Pearsall, 274 F.3d at 1217–18; 20 C.F.R. §§ 404.1545, 404.1546).

Lake argues that substantial evidence in the record demonstrates that that Lake has greater mental limitations than listed in the RFC.  (ECF No. 11 at 13.)  Lake asserts that the ALJ did not cite to any evidence to support his findings that she should be limited to simple, unskilled work.  (ECF No. 11 at 14.)  Lake notes that the ALJ gave little weight to the opinions of Dr. Feco and Dr. Segall, who both found Lake to be markedly limited in several areas.  (ECF No. 11 at 14-15.)  Lake contends that she is precluded from performing even simple, unskilled work

based upon her pain and mental impairments outlined in the Medical Source Statements provided by Dr. Feco and Dr. Segall. (ECF No. 11 at 14-15.) Lake contends that the ALJ's failure to give proper weight to the medical evidence provided, including the opinions of her treating physicians, or Lake's testimony that she is unable to work due to her impairments constitutes error and requires remand. (ECF No. 11 at 15.)

In this case, the Court finds that substantial evidence supports the ALJ's finding of Lake's RFC. As previously discussed, the ALJ considered Lake's testimony regarding her restrictions and found it to be contradicted by the medical record. Specifically, the ALJ noted that Lake's allegations of chronic pain from her neck were not supported by the medical record, which indicated that the pain was controlled by medication. The ALJ further noted that Lake was not receiving intense psychological treatment indicative of a severe mental impairment. Finally, the ALJ determined that Lake's allegations regarding her poor mental functioning were contrary to the persuasive medical evidence. The ALJ thus concluded that Lake's testimony as to the nature and severity of her symptoms was not credible. <u>Pearsall</u>, 274 F.3d at 1218. The record as a whole shows that the ALJ properly considered Lake's testimony as to her alleged work-related restrictions (to the extent it was not discredited), Lake's medical records, and the observations of Lake's treating physician, a consultative physician and her psychologist. <u>See</u> 20 C.F.R. §§ 404.1545(a), 404.1546 (2001) (responsibility for determining RFC rests with ALJ; determination should be based on all relevant evidence, including claimant's own description of limitations, observations of treating physicians and others, and medical records). <u>Pearsall</u>, 274 F.3d at 1218. For the above reasons, the Court rejects Lake's contention that the ALJ's determination of her RFC is contrary to the substantial evidence in the record.

**VI.** **Conclusion**

Based on the foregoing, the Court will affirm the decision of the Commissioner.

Accordingly,

**IT IS HEREBY ORDERED** that decision of the Commissioner is **AFFIRMED**, and Plaintiff's Complaint is **DISMISSED** with prejudice. A separate Judgment will accompany this Order.

Dated this 24th day of February, 2014.

_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE